\*\*E-Filed 10/15/09\*\*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| THOMAS VAN ZANDT,<br><br>            Plaintiff,<br><br>  v.<br><br>CITY OF SAN JOSE, et al.,<br><br>            Defendants. | Case Number C 07-04987 JF<br><br>ORDER[1] GRANTING CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING FEIN'S MOTION FOR SUMMARY JUDGMENT; AND DISMISSING ACTION WITHOUT PREJUDICE |

      Plaintiff Thomas Van Zandt ("Plaintiff") brings the instant action pursuant to 42 U.S.C. § 1983, California Civil Code §§ 52, 52.1 et seq., and California tort law. Plaintiff alleges that Defendants Casey Higgins ("Higgins"), Mark Natividad ("Natividad"), Daniel Pfiefer ("Pfiefer"), and Anthony Weir ("Weir"), all of whom are police officers employed by Defendant City of San Jose (collectively "City Defendants"), unlawfully seized him and searched his person and his vehicle in violation of the Fourth Amendment to the United States Constitution. Plaintiff also alleges that the City Defendants and Defendants Daniel Garcia ("Garcia") and Ryan Scott ("Scott") (collectively "Mall Security Defendants") violated his civil rights under California law and committed a battery upon him. Plaintiff claims that all Defendants are liable for

---

[1] This disposition is not designated for publication in the official reports.

Case No. C 07-04987 JF
ORDER GRANTING CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING FEIN'S MOTION FOR SUMMARY JUDGMENT; AND DISMISSING ACTION WITHOUT PREJUDICE
(JFLC3)

intentionally and negligently inflicting emotional distress upon him and for falsely arresting or imprisoning him. Finally, Plaintiff alleges that Defendant Samantha Fein ("Fein") violated Cal. Penal Code § 11172 by making a report of child abuse she knew to be false or with reckless disregard for the truth of the report.[2]

The City Defendants and Fein move for summary judgment as to all of the claims asserted against them. For the reasons discussed below, the motion of the City Defendants will be granted, and Fein's motion will be denied. Because none of Plaintiff's claims against Fein or the Mall Defendants presents a federal question, the Court has discretion as to whether to exercise supplemental jurisdiction over these claims, and it will decline to do so. The claims will be dismissed without prejudice to refiling in state court.

## I. BACKGROUND

**A.  Statement of Facts**

Except as otherwise indicated, the following facts are undisputed.

**1.  The Target Bathroom**

On the afternoon of November 26, 2006, Plaintiff visited Oakridge Mall in San Jose, California with his wife, his two sons Michael (then eleven years old) and Judah (then nine years old), and his daughter, Caroline. After leaving the family van with the Mall's parking valet, the Van Zandts had lunch at the Mall. After lunch, the Van Zandts split up: Mrs. Van Zandt and Caroline got their hair and nails done, while Plaintiff, Michael and Judah visited GameStop, a video game store. After about ten or fifteen minutes of shopping at GameStop, Plaintiff and Judah needed to use the restroom. Michael remained at GameStop while Plaintiff and Judah proceeded to Target, where Plaintiff had been told the nearest restroom was located.

At Target, Plaintiff and Judah noted that there was a wait for the men's restroom. (Target Surveillance Video ("Video"), 3:26:45.) Because of the wait, and because Plaintiff felt that

---

[2] Defendant Target Stores, a division of Target Corporation, erroneously sued as Target Stores, Incorporated, was dismissed with prejudice from this action pursuant to stipulation of the parties. Defendant Westfield, LLC was likewise dismissed with prejudice at Plaintiff's request.

2

Case No. C 07-04987 JF
ORDER GRANTING CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING FEIN'S
MOTION FOR SUMMARY JUDGMENT; AND DISMISSING ACTION WITHOUT PREJUDICE
(JFLC3)

1  Judah might get teased or mistaken for a girl because of his long hair, Plaintiff entered the family
2  restroom, and Judah followed him. (Video, 3:27:46.) The family restroom contained a baby
3  changing table, one sink, and one toilet which was not enclosed in a stall. Plaintiff proceeded to
4  use the toilet while Judah waited.

5        Fein also was at the Target in Oakridge Mall on November 26, 2009. Like Plaintiff, Fein
6  was shopping with her spouse and her children. Fein and her young son first arrived in the
7  vicinity several minutes after Plaintiff and Judah entered the restroom. (Video, 3:30:20.)
8  Seconds later, Fein's spouse and their young daughter entered the area. (Video, 3:30:25.) At one
9  point, Fein approached the family restroom door. For a few seconds while Fein attempted to turn
10 the handle to the door, Fein's head was within several inches of the door. (Video, 3:30:53-56.)
11 Shortly thereafter, Fein tried to convince her son to use the ladies' room instead. She talked to
12 her spouse in the ladies' room before returning to the hallway to wait for the family restroom.

13       Fein testified at her deposition that during the few seconds when she stood by the door,
14 she heard noises of a sexual nature. She later told police officers that "the noises she was hearing
15 could be sexual intercourse," and that, upon later seeing Plaintiff, "the appearance of the man
16 went together, in that he was masturbating inside the restroom." (Def. Pfiefer's Report 3-4.)
17 Plaintiff testified that there was no noise made in the restroom other than running water and
18 perhaps some quiet talking.

19       About a minute after Fein allegedly heard noises coming from inside the family restroom,
20 Plaintiff exited, leaving Judah inside. (Video, 3:32:14.) Fein, who by this time had returned to
21 the hallway and was waiting outside the family restroom once again, turned toward Plaintiff for
22 approximately one second before moving to enter the restroom. (Video, 3:32:19.) As Fein
23 approached the door, Plaintiff informed her that the restroom was occupied. (Video, 3:32:20-
24 24.) Plaintiff and Fein faced each other for approximately two seconds during this exchange.
25 Fein later told police officers that Plaintiff "blocked her," though Plaintiff contends, and the
26 video tends to show, that no such blocking occurred. (*Id.*; Def. Pfeifer's Report 4.)

27       Fein claims that as Plaintiff exited the restroom, he "appeared to be sweating profusely
28

and had an obvious erection." (Def. Fein's Mot. for Summ. J. "MSJ" 3: 9-10.) Plaintiff contends that he did not have an erection, especially one noticeable through his clothes, and that he was not sweating when he left the restroom. Plaintiff also contends that he and Fein looked each other in the face during their brief encounter and that Fein could not have observed, from her body position and in such a short period of time, that Plaintiff had an obvious erection, that Plaintiff was sweating, that Plaintiff refused to make eye contact, or that Plaintiff's eyes were darting. (Video 3:32:22-24.)

After the encounter with Fein, Plaintiff walked out of the hallway, and nearly out of the range of the surveillance video, where he claims he was waiting for his son. (Video, 3:32:28-3:34:44; Fein Dep., 55:14-17.) Fein testified that after watching Plaintiff walk away from the restroom, she took her son into the women's restroom, where, as part of her "strong emotional reaction" to what she claims to have seen, she "screamed" at her spouse, "you've got [their son]." (Fein Dec. ¶5; Video, 3:32:56.) Fein then exited the restroom with her daughter, who skipped ahead of Fein toward the end of the hallway where they had left their stroller. Plaintiff claims that review of the video shows no such obvious reaction or urgency in Fein's demeanor. (Video, 3:34:2-9.)

Moments later, Plaintiff re-entered the hallway and positioned himself roughly directly across from the restroom. (Video, 3:34:48.) For a few seconds, Plaintiff looked at a piece of paper he had removed from his wallet. (Video, 3:35:4-9.) Fein reported to security that both she and her spouse noticed that Plaintiff "was holding a valet parking ticket and was shaking it in a nervous manner." (Def. Fein's MSJ 3:26.) Plaintiff contends that Fein could not have observed this from her vantage point as shown in the video and that the video does not support Fein's "nervous," "shaking" characterization of his behavior.

After a few more moments, Judah exited the restroom. (Video, 3:35:10-14.) Plaintiff contends that Judah exited with his head up, approached his father, and "clearly showed–in an obvious response to a question by [Plaintiff]–that he had washed his hands." (Pl. Opp. to Def. Fein's MSJ 5:2-3.) Plaintiff claims that he then put his left arm around Judah's shoulder as they

4

1   "slowly and casually exited the hallway, then Target, heading back to the GameStop." (*Id.* at 5:
2   4-5; Video, 3:35:14-20.)
3       Fein claims that Judah was "looking at the ground" when he exited and that she believed
4   Judah was a ten or twelve year old girl, had a slumped appearance, and "looked very pale, like
5   [he] had seen a ghost." (Def. Fein's MSJ 4:3-4.) Fein also alleges that Plaintiff "put his harm
6   over [Judah's] shoulder and 'strongly' led her [sic] out of the store" and that "[t]he manner in
7   which [P]laintiff led [Judah] away looked uncomfortable and not like normal parental behavior."
8   (*Id.* at 4:4-7.)
9       Now believing that she had heard a sexual noise while Plaintiff was in the restroom with
10  a twelve year old girl, Fein reported her observations to Target security. (Fein Dec. ¶ 3-6.)

    **2.    Mall Security[3]**

12      After Fein reported her observations to Target security staff, the Target employees
13  notified mall security. Fein told Target security that Plaintiff had been in the restroom with a
14  child and that when he exited the restroom, he was perspiring heavily and had an erection. Soon
15  after leaving the restroom, Plaintiff went to pick up the family's vehicle from the valet, leaving
16  his sons at a store in the mall. When Plaintiff saw the parking valet approaching with his van, he
17  walked to the van, and after the valet got out he sat in the driver's seat. At this point, he was
18  contacted by an unknown man who removed him from the vehicle, allegedly causing Plaintiff to
19  strike the ground. As he got up, Plaintiff noticed that another person had arrived and became
20  aware that the two individuals were security guards, later identified as Defendants Garcia and
21  Scott, who were employed by Defendant Professional Security Consultants, a private security
22  firm hired by Oakridge Mall. The two security guards led Plaintiff to the sidewalk near the valet
23  stand and informed him that they believed he had been involved in an incident at Target.
24  Plaintiff told the security guards that his children were waiting for him and asked for an
25  explanation as to why he was being held. Dissatisfied with the guards' response, Plaintiff called

---

[3]The facts in this Section are taken directly from the City Defendants' papers and are undisputed for the purposes of this motion. (Pl. Opp. to City Defs.' MSJ 2: 12-13.)

911 to request police assistance. However, San Jose police already had been called by mall employees. As Fein was walking out of the mall, she saw Plaintiff being questioned in the parking lot. She told a security guard who was watching from a distance that Plaintiff was the man she had reported. The guard asked her to stay to provide a statement, which she did.

### 3. San Jose Police Officers

Officers Higgins, Pfiefer, and Natividad responded to the scene. A police dispatcher informed the officers of a possible child molestation at the mall based on a report that a man had been in a restroom with a female child and had exited the restroom with an erection. The dispatcher also informed the officers that the alleged victim had been neither identified nor found.

Higgins was the first to arrive at Plaintiff's location, at approximately 4:33 P.M. Higgins did not talk to Plaintiff immediately. At some point, one of the officers frisked Plaintiff and placed him in the back seat of Higgins' patrol vehicle. Disputes exist as to which officer frisked Plaintiff and as to whether Plaintiff entered the patrol car voluntarily. Prior to being placed into the patrol car, Plaintiff was overheard by mall security saying that he needed to get his children, who were waiting just inside the mall. None of the police officers has ever testified to having heard Plaintiff say this, or that mall security told them that Plaintiff said it.

After Plaintiff was in the patrol vehicle, Higgins looked through the windows of Plaintiff's van for signs of a victim. Higgins claims that he saw, "in plain view," children's backpacks and a female's purse in the van. (City Defs.' MSJ 6:3-4.) Higgins then entered the van and searched the purse, the backpacks, and pouches inside the van. Higgins performed this search within ten minutes of arriving on the scene and without Plaintiff's consent.

Pfiefer spoke with mall security upon his arrival. According to the City Defendants, the security guards advised Pfiefer that the suspect had been in the restroom with a child and had come out of the restroom sweating, and that Plaintiff had been uncooperative and in a hurry to retrieve his vehicle from the valet. The security guards also told Pfiefer that Plaintiff had told them that it was "[n]one of [their] business" whom he had come to the mall with and that he had "insisted that he was by himself." (City Defs.' MSJ 5: 5-7.)

After speaking to Fein, Pfiefer, assisted by Higgins, made contact with Plaintiff, who was still in the back of the patrol vehicle with the door open. Defendants claim that Plaintiff refused to provide them with identification. Plaintiff claims that he had already provided identification and merely declined to do so again.

Natividad arrived on scene at approximately 4:39 P.M. After speaking with Target security personnel and watching the eleven-minute surveillance video, Natividad drove to Plaintiff's location. While en route, Natividad was informed that the "victim" had been located, that "she" actually was male, and that he was Plaintiff's son, Judah. Natividad then contacted Plaintiff and "started to explain why he had been detained." (CMSJ 6: 23-24.) After speaking with Plaintiff, Natividad contacted Michael and Judah and spoke with Judah for ten to fifteen minutes. Both children stated that Plaintiff had never hurt them or done anything bad to them. Judah told Natividad that nothing bad had happened in the Target restroom.

Plaintiff was released, with his children, sometime around 6:00 P.M. No charges were filed, and Plaintiff never was formally arrested in connection with the incident.

### 4. The Instant Action

Plaintiff filed the original complaint in this action on September 26, 2007, and the operative Second Amended Complaint ("SAC") on May 19, 2008. The parties have completed discovery, but there is no pending trial date.

## II. LEGAL STANDARD

Summary judgment is appropriate when there are no genuine and disputed issues of material fact and the moving party is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view the evidence in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in favor of that party. *Torres v. City of Los Angeles*, 540 F.3d 1031, 1039-40 (9th Cir. 2008). The moving party bears the burden of showing that there is no material factual dispute. Therefore, the Court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

A. **Section 1983 Claims**

1. **Failure to Establish Municipal Liability**

The City moves for summary judgment on the ground that it cannot be held liable under 42 U.S.C. § 1983 because Plaintiff has not established a legal basis for municipal liability. Municipalities "may be liable under § 1983 when the allegedly unconstitutional act stems from a municipal policy, decision or custom." *Del Conte v. San Francisco Police Dep't*, 2009 WL 2871052 *2 (N.D. Cal. Sept. 1, 2009) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978)). While recognizing that Plaintiff bases his Section 1983 claim upon the doctrine of *respondeat superior*, the City observes correctly that:

> a city can be liable for the acts of an individual employee under three theories: (1) if the employee was "acting pursuant to official city policy;" (2) "if an employee commits a constitutional violation pursuant to a long-standing practice or custom;" or (3) if "the person causing the violation has final policymaking authority."

*Id.* (citing *Webb v. Sloan*, 330 F.3d 1158, 1163-64 (9th Cir.2003)). City contends that Plaintiff fails to provide evidence meeting any of the three *Monell* requirements.

Plaintiff does not oppose the City's motion as to his Section 1983 claims. There being no issue of material fact as to this dispositive issue, the City is entitled to judgment as a matter of law.

2. **Qualified Immunity**

Higgins, Natividad, Pfeifer, and Weir contend that, even if their actions violated Plaintiff's Fourth Amendment rights, they are shielded by the doctrine of qualified immunity. The Supreme Court has held that qualified immunity "is an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) and, accordingly, the Court has emphasized "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224 (1991). Moreover, the Ninth Circuit has provided lower courts with a specific framework within which to analyze law enforcement officers' claims of qualified immunity for alleged Fourth Amendment violations:

> "When a law enforcement officer asserts qualified immunity from liability for Fourth Amendment violations, the district court must determine whether, in light of clearly established principles governing the conduct in question, the officer

8

objectively could have believed that his conduct was lawful. This standard requires a two-part analysis: 1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable officer have believed the conduct was lawful?"

*Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

The facts relevant to the first prong of the analysis are not in dispute. The officers do not contend that Fourth Amendment principles regarding the search and seizure of individuals and their belongings are not clearly established. They do contend, however, that, even if the Court finds each of their challenged actions unlawful, a reasonable officer could have believed that they were lawful. In response, Plaintiff argues that Defendants' qualified immunity argument "ha[s] only duplicated their argument that reasonable cause existed to conduct the searches and seizures of Plaintiff's person and property, i.e. that they did not commit any violations of civil rights." (Def. Opp. 14:6-8.) Essentially, Plaintiff asserts that "[i]t is not possible . . . to say that one 'reasonably' acted 'unreasonably.'" *Anderson*, 483 U.S. at 643. In rejecting this precise argument in *Anderson*, the Supreme Court "recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials–like other officials who act in ways they reasonably believe to be lawful–should not be held personally liable." *Id.* at 641.

    **a.**    **Initial Detention**

Plaintiff alleges that his initial detention by the officers was an unreasonable seizure under the Fourth Amendment. A police officer may briefly detain and question a person if the officer reasonably suspects criminal activity, even in the absence of probable cause to arrest the person. *United States v. Hensley*, 469 U.S. 221, 226 (1985); *Brown v. Texas*, 443 U.S. 47, 51 (1979); *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Under the Fourth Amendment, such a seizure must be based on a reasonable suspicion, grounded in specific and articulable facts, that the person was involved in past or present criminal activity. *Hensley*, 469 U. S. at 229; *Brown*, 443 U.S. at 51; *Terry*, 392 U.S. at 21. The facts must "be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of

9

reasonable caution in the belief that the action taken was appropriate?" *Terry*, 392 U.S. at 21-22 (internal quotation omitted). When detaining a person under *Terry*, a police officer is entitled to conduct a limited investigation to determine if the person was involved in criminal activity. *See Hensley*, 469 U.S. at 229; *Florida v. Royer*, 460 U.S. 491, 498 (1983); *Terry*, 392 U.S. at 30. The investigation can be no more intrusive than necessary to either dispel or confirm the officer's suspicion. *See Royer*, 460 U.S. at 500; *Terry*, 392 U.S. at 30.

Here, it is undisputed that the officers were told prior to their arrival that there had been a report of a potential molestation of a young girl in a Target bathroom. The dispatcher had reported that the male suspect had come out of the Target bathroom with an erection, that the suspect was in the custody of mall security guards, that the suspect was initially uncooperative and tried to run, and that the alleged victim had not been found. All of this information had been received prior to his arrival by Higgins, the first officer to contact Plaintiff in the area of the mall indicated by the dispatcher. Higgins also was informed that Plaintiff had called 911 saying that he was being held by mall security guards against his will and had not been advised as to why he was being held.

Higgins did not speak to Plaintiff immediately. Though the parties dispute the facts that led to Plaintiff being placed in the back of Higgins' patrol car, Plaintiff was not interrogated or handcuffed at this time, and Plaintiff has offered no evidence that the door to the patrol car was ever closed or locked while he was inside.

The Court concludes that Higgins' initial decision to detain Plaintiff upon his arrival, or, more accurately, to continue the detention that the mall security guards had begun, was supported by reasonable, articulable suspicion. At the very least, the information provided by the dispatcher permitted a reasonable officer in Higgins' position to believe there were grounds for an immediate detention of Plaintiff. Higgins and the other officers thus are entitled to qualified immunity with respect to the initial detention.

        **b.**    **Continued Detention**

Plaintiff next contends that, even if his initial detention was justified, the detention became an arrest because of the length of the time he was held. As both parties recognize in their

10

Case No. C 07-04987 JF
ORDER GRANTING CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING FEIN'S MOTION FOR SUMMARY JUDGMENT; AND DISMISSING ACTION WITHOUT PREJUDICE
(JFLC3)

papers, a lawful seizure can become unlawful "if it is prolonged beyond the time reasonably required to complete its mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

Relying on the Ninth Circuit's decision in *United States v. Chamberlin*, 644 F.2d 1262 (9th 1980), Plaintiff argues that his eighty-minute detention "in effect became an arrest." (Def. Opp. 8:3.) In *Chamberlin*, the Ninth Circuit found that a twenty-minute detention did not fall within *Terry* and its progeny and was unreasonable because it was not supported by probable cause. Plaintiff contends that "no reasonable officer could conclude that it was reasonable to detain Plaintiff for eighty minutes, not when nearly thirty-year-old 9th Circuit precedent, based on even older Supreme Court precedent, held that a twenty-minute detention was unconstitutional without probable cause." (Id. at 15-20.)

Plaintiff's argument overlooks the fact that the reasonableness of a detention depends upon the "totality of the circumstances." As the Ninth Circuit has held when faced with a similar argument:

> The critical inquiry is whether the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." [*United States v.*] *Sharpe*, 470 U.S. [675,] 686, 105 S.Ct. [1568,] 1575 (1985). "Brevity" can only be defined in the context of each particular case. *See United States v. Place*, 462 U.S. 696, 709 n. 10, 103 S.Ct. 2637, 2646 n. 10, 77 L.Ed.2d 110 (1983) ("Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.") The Court has further explained that "[i]f the purpose underlying a Terry stop-investigating possible criminal activity-is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in Terry." *Michigan v. Summers*, 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 69 L.Ed.2d 340 (1981).

*U.S. v. Torres-Sanchez*, 83 F.3d 1123, 1128 -29 (9th Cir. 1996).

In *Torres-Sanchez*, the Ninth Circuit rejected the argument that a detention had progressed into an arrest where the officer, after pulling a car over for speeding, having no license plates, and having illegally tinted windows, questioned the driver in his patrol car for twenty minutes regarding the ownership of the vehicle. In holding that the detention was reasonable and did not constitute an arrest, the court noted that the officer "used no threats of force, unnecessary delays, exaggerated displays of authority or other coercive tactics. . . [The

officer's] purpose in questioning Sanchez was to clear up appropriate questions about ownership of the truck." *Id.* at 1129.

Similarly here, during the eighty minutes Plaintiff was detained in the patrol car, the officers conducted many tasks directly related to the report of child molestation. Their investigation included: speaking to the two security teams on site, watching the security video, speaking to Fein about what she had seen, and finding and interviewing Plaintiff's two sons, one of whom was the supposed victim. The interview with the supposed victim alone took ten to fifteen minutes. While Plaintiff alleges that the length of his detention was unreasonable, he does not allege that the officers used any threats of force against him, unnecessarily delayed their investigation, or otherwise prolonged the search through activities unrelated to resolving the matter in an expeditious manner.

Considering all of these factors, and viewing the disputed facts in the light most favorable to the Plaintiff, the Court concludes that under the totality of the circumstances, the detention at issue here did not ripen into an arrest necessitating a showing of probable cause. The Court finds that reasonable, articulable suspicion existed for the detention, prolonged as it was by the nature of the report being investigated.

        **c.**    **Search of Plaintiff's Person**

Plaintiff claims one of the officers violated his Fourth Amendment right against unreasonable searches by pat-searching or frisking him prior to placing him in Higgins' patrol car. "Under the Fourth Amendment, a search for weapons is permissible 'for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual.'" *Ramirez v. City of Buena Park* 560 F.3d 1012, 1021 (9th Cir. 2009) (citing *Terry*, 392 U.S. at 27). "A wide variety of factors support a reasonable belief that an individual is armed and dangerous. These include an officer's observation of a visible bulge in an individual's clothing; sudden movements or repeated attempts to reach for an object not immediately visible; and the *nature of the suspected crime*." *Id.* (internal citations omitted) (emphasis added).

Here, while there is a dispute as to which officer actually frisked Plaintiff, it is undisputed that all of the officers on the scene were apprised of the following information: Plaintiff had been

positively identified as a person suspected of child molestation; the alleged victim was nowhere to be found at the time of the pat-down; and Plaintiff initially had been uncooperative and had tried to run away from the security guards who initially confronted him.  Clearly, the nature of the suspected crime, while not necessarily involving a weapon, was serious.  Taken together, the facts known to the officers provided a sufficient basis for a reasonable belief that Plaintiff might be dangerous.  The Court concludes that a reasonable officer could believe that briefly pat-searching Plaintiff before placing him in a patrol car was warranted.

### d. Search of Plaintiff's Vehicle

Plaintiff claims that Higgins violated his Fourth Amendment rights against unreasonable searches by searching Plaintiff's vehicle without consent, a search warrant, probable cause, or exigent circumstances.  Defendants argue that Higgins reasonably could have believed that exigent circumstances existed.

In *Brigham City v. Stuart*, 547 U.S. 398 (2006), the Supreme Court held that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Brigham City*, 547 U.S. at 403 (citations omitted).  The Court concluded that the officers' warrantless entry into a home was reasonable because of the officers' observations of a violent altercation inside the home.  *Id.* at 406.  The Court stressed that the test is objective rather than subjective and that the officer's actual motivations are irrelevant to the Fourth Amendment inquiry.  *Id.* at 404.

Following the Supreme Court's ruling in *Brigham City*, the Ninth Circuit adopted a two-prong test to guide lower courts in applying the exigency or emergency exception to the warrant and probable cause requirements.  *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008).  The court held that the first prong of the analysis asks whether "considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm."  *Id.*  Here, Defendants contend that it was objectively reasonable for Higgins to believe that searching for identification

13

in the purse and children's backpacks would help to preserve life or avoid serious injury. At the time of the search, Higgins knew only that there was a report of child molestation inside the mall, that the alleged victim was a ten or twelve year old girl, that Plaintiff had been identified as the suspect who had been seen with a young child, and that the alleged victim was nowhere to be found and nothing was known about her identity. Defendants argue that finding identification inside Plaintiff's vehicle could have helped officers find the presumed victim, whose identity and whereabouts were unknown but who was thought to be in danger. Plaintiff argues that finding identification "would [have] be[en] of absolutely zero value in trying to find somebody in a mall, or anywhere but the address listed in the card." (Pl.'s Opp. to City Defs.' MSJ 11:17-18.)

The Court concludes that it was reasonable for Higgins to believe, based on the information available to him at the time, that the search was necessitated by the urgency of the situation and the potential danger to the unidentified and missing victim of a suspected child molestation. Higgins had reasonable grounds to believe that finding the victim's name or picture could have contributed to finding the victim.

*Snipe* also requires that the scope of the search justified by exigent circumstances be reasonable. *See, e.g.*, *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008) (holding that the second prong of the emergency exception requires that "the search's scope and manner [be] reasonable to meet the need"). Plaintiff makes no argument that Higgins' search of the purse, backpacks, and pouches inside the vehicle exceeded the bounds of a search for the purposes of identifying the victim's whereabouts.

As the Ninth Circuit held recently in a case originating in this district, "It is the need for taking immediate action in the face of rapidly evolving circumstances that the Supreme Court dictates must guide our reasonableness analysis under the Fourth Amendment." *Fisher v. City of San Jose*, 558 F.3d 1069 (9th Cir. 2009). Higgins' search of Plaintiff's vehicle for identifying information was reasonable in light of the facts known to him at the time: that Plaintiff had been positively identified as the person suspected of molesting a young girl inside the mall; that the alleged victim had not been found or identified; and that Higgins had observed the purse and backpacks from outside the vehicle.

**C.       Plaintiff's Claims Under the Tom Bane Civil Rights Act**

Plaintiff alleges that the officers and the Mall Security Defendants violated his rights pursuant to the Tom Bane Civil Rights Act, California Civil Code Sections 52, 52.1 et. seq., by improperly detaining him and searching his person and vehicle.  The City Defendants seek summary judgment on this claim because Plaintiff has failed to establish any violation of a civil right.

In his opposition papers, Plaintiff concedes that with respect to the City Defendants, the analysis of the "civil right violation" element of his Bane Act claim is identical to the Fourth Amendment analysis with respect to his Section 1983 claims.  (Pl's Opp. to City Defs.' MSJ 15: 5-6 ("The analysis is the same, and Plaintiff urges the Court to reach the same conclusions here, as above in [the sections addressing the search and seizure of his person and vehicle].").) Because the Court concludes, for the reasons discussed above, that the officers' actions were reasonable, Plaintiff cannot establish the "civil right violation" element of his Bane Act claim.

**D.       Plaintiff's State-Law Claims Against the City Defendants**

**1.       Officer Liability**

Plaintiff asserts claims of battery, infliction of emotional distress, and false arrest against the City Defendants.  All of these claims a determination that the officers' actions were unreasonable.  As discussed above, the Court concludes that there are no genuine issues of material fact relating to the reasonableness of the officers' investigation and that the officers acted reasonably in detaining Plaintiff and searching his person and his vehicle.

**2.       Municipal Liability**

Plaintiff also asserts his state-law claims against the City.  However, because the City's liability is premised on the theory of respondeat superior and the City's employees are entitled to qualified immunity, there is no basis for municipal liability.

**E.       Plaintiff's Claims Against Fein**

**1.       Statutory Immunity**

Fein first asserts that Plaintiff's claims against her are barred by Cal. Penal Code § 11172(a), which recognizes a qualified immunity for voluntary reporters of suspected child

15

abuse. The statute distinguishes between "mandated reporters" and voluntary reporters. Cal. Penal Code § 11172(a) (2009). The statute provides mandated reporters with absolute civil and criminal immunity for reports of abuse and neglect. Voluntary reporters, on the other hand, are immune from civil and criminal liability "unless it can be proven that a false report was made and the person knew that the report was false or was made with reckless disregard of the truth or falsity of the report." *Id.*

Fein contends that the undisputed facts establish that she is entitled to qualified immunity under the statute. Fein argues that because the parties agree that she subjectively believed that a young girl was being abused by an adult male when she made the report, the immunity necessarily applies. However, as Plaintiff counters in his opposition papers, a firm subjective belief that a report is true cannot, by itself, establish that the reporter did not "recklessly disregard the truth." Rather, as defined in the context of defamation, reckless disregard of the truth is characterized by "serious indifference to truth or accuracy of a publication." *Black's Law Dictionary* (8th ed. 2004). Because a jury could find that a person believed that something was true and at the same time displayed reckless indifference to facts inconsistent with that belief, the Court rejects the argument that Fein's good faith belief alone establishes qualified immunity.

The following facts with respect to Fein's observations are undisputed: Fein stood outside the family restroom for approximately two minutes while Plaintiff was inside (Video, 3:30:20-3:32:14.); Plaintiff's young son, who had long hair and a pale complexion, also was inside the restroom; when Fein attempted to open the restroom door after Plaintiff had exited, Plaintiff told Fein that someone was still inside; Plaintiff's son appeared old enough and capable enough to use the restroom by himself; and Plaintiff left the restroom area with his son. Almost every other fact regarding Fein's observations is vigorously disputed. Among these facts are: whether Plaintiff made any groaning or "sexual sounds" while in the restroom; whether Plaintiff had an erection, let alone an "obvious erection," when he exited the bathroom; whether, if Plaintiff did have an obvious erection, Fein had an opportunity to observe it; whether Plaintiff was sweating when he exited the restroom; Plaintiff's demeanor as he waited for his son; Plaintiff's son's demeanor when he exited the restroom; and the manner in which Plaintiff led his son away from

16

the restroom area.

Fein is correct that Plaintiff will have a heavy burden at trial in attempting to overcome Fein's immunity from liability for an apparently mistaken report of child abuse. Nonetheless, viewing the facts presented in the light most favorable to the Plaintiff, and particularly based upon its own review of the videotape, the Court concludes that a reasonable jury could find that Fein made her report with reckless disregard of the truth.

### 2. Intentional Infliction of Emotional Distress

Fein also moves for summary judgment with regard to Plaintiff's claim for intentional infliction of emotional distress. She contends that Plaintiff cannot establish the first requirement of the claim: "extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress." *McMahon v. Craig*, 176 Cal. App. 4th 1502, 1515 (Cal. Ct. App. 2009) (citation omitted).

Fein again relies on her subjective good faith belief. She argues that making a report of child abuse based on a good faith belief cannot, as a matter of law, constitute "extreme and outrageous conduct." In opposition, Plaintiff alleges that, despite her good faith belief, Fein recklessly disregarded the truth in making her report, and in so doing recklessly disregarded the probability of causing Plaintiff emotional distress. Should Plaintiff prove that proposition at trial, a reasonable jury could find that Plaintiff had established this element of his claim for intentional infliction of emotional distress.

### 3. Private Right of Action Under Penal Code Section 11172

Fein also argues that, even if she is not immune from suit, Plaintiff fails to state a claim for violation of Cal. Penal Code § 11172 because that statute does not create a private right of action. Fein relies upon *Chabak v. Monroy*, 154 Cal. App. 4th 1502, 1510 (2007) in support of this proposition. Far from establishing the rule for which Fein cites it, *Chabak* merely characterized the issue as "questionable" and held that "resolution of the issue is unnecessary here." *Id.* Given its intention not to exercise its supplemental jurisdiction over Plaintiff's claims against Fein, the Court leaves this issue for resolution by the state court.

//

Case No. C 07-04987 JF
ORDER GRANTING CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING FEIN'S MOTION FOR SUMMARY JUDGMENT; AND DISMISSING ACTION WITHOUT PREJUDICE
(JFLC3)

### F. Supplemental Jurisdiction

While federal courts may exercise supplemental jurisdiction over state-law claims "that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," 28 U.S.C. § 1367(a), a court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction," *id*. § 1367(c)(3). Indeed, unless "considerations of judicial economy, convenience[,] and fairness to litigants" weigh in favor of the exercise of supplemental jurisdiction, "a federal court should hesitate to exercise jurisdiction over state claims." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity."); *accord City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156 (1997).

There is no pending trial date in this manner and, following this order, the instant action no longer will contain any viable federal claims. Moreover, no party has contended that this Court's exercise of jurisdiction over the remaining state-law claims would serve the purposes the Court is required to consider. Because the relevant factors do not favor the exercise of jurisdiction over Plaintiff's remaining state-law claims, the Court will decline to exercise supplemental jurisdiction over them.

## IV. CONCLUSION

For the foregoing reasons, the motion of the City Defendants will be granted, and Fein's motion will be denied. Plaintiff's remaining state-law claims are dismissed without prejudice to refiling in state court. The Clerk shall close the file.

IT IS SO ORDERED.

DATED: 10/15/09

_____
JEREMY FOGEL
United States District Judge

18

Case No. C 07-04987 JF
ORDER GRANTING CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING FEIN'S MOTION FOR SUMMARY JUDGMENT; AND DISMISSING ACTION WITHOUT PREJUDICE
(JFLC3)

Copies of Order served on:

David John Stock    dstock@rllss.com, slawrence@rllss.com

Dennis R. Ingols    dingols@rrpassociates.com, admin@rrpassociates.com, rrpstaff@yahoo.com, schabra@rrpassociates.com, urivera@rrpassociates.com

Jon Allen Heaberlin    jheaberlin@rllss.com

Kim James    kjames@npllaw.com

Michael R. Groves    CAO.Main@sanjoseca.gov

Rebecca S. Widen    rwiden@htalaw.com

Robert Ross Powell    rpowell@rrpassociates.com, admin@rrpassociates.com, rrpstaff@yahoo.com, schabra@rrpassociates.com

Sejal Ojha    sxo@mmker.com

Steven Sheriff Abern    abern1@yahoo.com, ldobbins@htalaw.com

Case No. C 07-04987 JF
ORDER GRANTING CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING FEIN'S MOTION FOR SUMMARY JUDGMENT; AND DISMISSING ACTION WITHOUT PREJUDICE
(JFLC3)